FILED

99 JUN 28 PM 1: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

JUN 28 1999

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                  :
PAUL MORRIS GARST, et al., on behalf of           :
themselves and all others similarly situated,     :     No. 97-C-0074-S
                                                  :
              Plaintiffs,                          :
                                                  :
v.                                                 :
                                                  :
THE FRANKLIN LIFE INSURANCE                        :
COMPANY, et al.,                                   :
                                                  :
              Defendants.                          :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
```

### FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

Plaintiffs and defendants have submitted for approval a proposed

settlement of this class action that is memorialized in a Stipulation of Settlement and a

First Amendment to the Stipulation of Settlement, filed with the Court on December 16,

1998 and May 28, 1999, respectively (referred to collectively as the "Settlement

Agreement" or "Settlement"). For the reasons set out below, the Court has determined

that the Settlement is fair, adequate and reasonable and should therefore be approved.

The Court makes the following findings of fact and conclusions of law. It has previously

130

issued an Order Approving Class Action Settlement and a Final Judgment approving the

Settlement and dismissing the complaint in this action with prejudice.

## I.    BACKGROUND

### A.    Materials Considered by the Court

1.    In reaching its decision in this case, this Court has considered the

written submissions of the parties.  As discussed below, both sides have fully briefed the

request for approval, and they have supported the request with numerous declarations and

affidavits of fact and expert witnesses.  Both plaintiffs' counsel and defendants' counsel

also made oral presentations at the June 1, 1999 Fairness Hearing.

2.    As discussed in more detail below, the Court also considered the

written objections submitted by Class Members.

### B.    History of the Litigation

3.    On September 23, 1996, Paul Morris Garst filed *Garst v. Franklin

Life Insurance Company, et al.*, Case No. CV-96-5671, in the Circuit Court for Jefferson

County, Alabama.  On November 22, 1996, defendants The Franklin Life Insurance

Company and The American Franklin Life Insurance Company (collectively, "Franklin")

filed a motion to dismiss.  Weiss/Stoia Decl. ¶ 35.[1]

---

1.  Declarations and Affidavits submitted by the parties are cited, respectively, as "[Witness]
Decl. ¶ __" and "[Witness] Aff. ¶ __."

2

4. On January 8, 1997, plaintiff Garst filed a first amendment to his complaint. *Id.* ¶ 36. On January 9, 1997, Franklin removed the action to this Court. *Id.* ¶ 37. That same day, plaintiff filed a second amended complaint to assert class action allegations. The Court denied Franklin's motion to dismiss on January 23, 1997. *Id.* ¶ 35.

5. Franklin served its Initial Disclosure pursuant to Fed. R. Civ. P. 26(a)(1) on May 30, 1997. *Id.* ¶ 39. Plaintiff Garst served his Rule 26 Initial Disclosure on October 31, 1997. *Id.* Throughout this period, the parties negotiated Franklin's production of additional documents and other discovery. *Id.* ¶ 39.

6. Following initial discovery, Franklin moved for reconsideration of its motion to dismiss on June 5, 1997. *Id.* ¶ 40. The Court denied this motion on June 26, 1997. *Id.*

7. Franklin moved for summary judgment on October 23, 1997. *Id.* ¶ 41. On January 27, 1998, the Court denied Franklin's motion with regard to plaintiff's breach of contract and unjust enrichment/constructive trust claims and granted the motion with respect to Franklin's sales agent, Jimmy Samudio. *Id.*

8. Plaintiff moved for class certification on April 1, 1998. *Id.* ¶ 42. The scheduled hearing on this motion did not take place in light of the settlement discussions that were then ongoing.

3

9. On August 12, 1998, plaintiff Fred McNatt, Jr., moved to intervene as a plaintiff in this action. Mr. McNatt had previously filed a putative class action in the Circuit Court of Clay County, Alabama. He moved to dismiss that case without prejudice on September 3, 1998.

10. At the same time that this action was proceeding, two additional putative class actions were filed against Franklin in state court in Illinois and in federal court in Florida. The Illinois action, *Dunn v. The Franklin Life Insurance Company*, Civ. No. 970L-250 (3d Jud. Cir., Madison County, Ill.), was filed on February 11, 1997. The Florida action, *Baker, et al. v. The Franklin Life Insurance Company*, Case No. 98-119-CIV-T-26B (M.D. Fla.), was filed on January 16, 1998. *See* Weiss/Stoia Decl. ¶¶ 44-56.

11. On December 10, 1998, certain of the *Dunn* and *Baker* plaintiffs Patricia A. Baker, Dale L. Baker, Sr., Sheila Magofna, Patrick W. Berteau, April L. Berteau, James A. Volkman, Rebecca J. Volkman, Howard G. Humberger, Eric D. Hagen and Edward M. Abroms, along with plaintiffs Garst and McNatt, filed a motion for leave to file an amended complaint in this case, attaching to the motion plaintiffs' proposed third amended complaint. *Id.* ¶ 57. The Court granted leave on December 28, 1998 and the complaint was entered on the court's docket on December 30, 1998. *Id.* The allegations in the third amended complaint are similar to those made in the original complaint filed in this case, as well as those made in the *Dunn* and *Baker* cases. *Id.*

4

### C. Plaintiffs' Allegations

12.     The third amended complaint is brought on behalf of a nationwide class of persons or entities (the "Class" or "Class Members") who, at any time from January 1, 1982 through December 31, 1997 (the "Class Period"), had an ownership interest in one or more Franklin whole life, universal life or variable universal life insurance policies issued in the United States during the Class Period. The Class description (including identification of the individuals and entities who are specifically excluded from the Class) is set out in the Court's Order Approving Class Action Settlement and Final Judgment, both of which were entered on June 1, 1999. Pursuant to Fed. R. Civ. P. 60(a), the Court also entered an Order Correcting the Order Approving Class Action Settlement and Final Judgment. This order corrected certain clerical mistakes in the list of Class Members who excluded themselves from the Class.

13.     The complaint[2] asserts twelve different causes of action, including federal claims based upon 18 U.S.C. § 1962 and common law claims based on fraud, breach of contract and negligent misrepresentation. The complaint seeks declaratory and injunctive relief, reformation and restitution, and compensatory and punitive damages.

_____

2. All references to plaintiffs' complaint are to the third amended complaint docketed on December 30, 1998.

5

14. Plaintiffs allege that Franklin engaged in misleading practices in selling its whole life, universal life and variable universal life insurance policies. They allege that Franklin developed a "fraudulent scheme and common course of deceptive sales and marketing practices to increase the Company's revenues and profitability and to compete with other insurance companies that offered high-return, participating and non-participating permanent life insurance policies." [Comp. ¶ 3]

15. The specific practices alleged in the complaint include, among other things, that:

a. Franklin, through the use of false and misleading illustrations, induced policyowners to believe that only a fixed number of out-of-pocket premium payments would be necessary to satisfy their premium obligations (a sales concept known throughout the insurance industry as the "vanishing premium" concept) [Comp. ¶ 72];

b. Franklin approved a widespread practice to sell replacement life insurance policies to existing and prospective policyowners [Comp. ¶ 58];

c. Franklin deceived policyowners into believing that they were purchasing investment, retirement, pension, estate or savings plans rather than life insurance policies [Comp. ¶ 51];

6

        d.      Franklin misrepresented to policyowners that its policies would provide a certain amount of cash and/or account values [Comp. ¶ 46]; and

        e.      Franklin engaged in abuses and other misconduct with respect to the administration and servicing of its insurance policies sold to Class Members [Comp. ¶ 32].

      16.     Franklin has denied all allegations of wrongdoing.

### D.    The Parties and Their Counsel

      17.     **The Class Representatives** — Plaintiffs Paul Morris Garst and Fred McNatt are citizens of Alabama. [Comp. ¶¶ 9, 20] Plaintiffs Patricia A. and Dale L. Baker, Sr., and Patrick W. and April Berteau are citizens of Vermont. [Comp. ¶¶ 10,11,13,14] Plaintiffs Sheila Magofna, James A. and Rebecca J. Volkman, Howard G. Humberger and Eric D. Hagen are citizens of Florida. [Comp. ¶¶ 12, 15-18] Plaintiff Edward M. Abroms is a citizen of California. [Comp. ¶ 19]

      18.     The Class representatives allege a wide variety of fraudulent conduct on behalf of Franklin in its marketing, sale, servicing and administration of their policies.

      19.     **Class Counsel** — The plaintiffs and the Class are represented by the law firms of Milberg Weiss Bershad Hynes & Lerach LLP ("Lead Counsel"); Abbey, Gardy & Squitieri, LLP; Arnzen, Parry & Wentz, P.S.C.; Berman DeValerio & Pease

LLP; Bonnett, Fairbourn, Friedman & Balint, P.C.; Campbell Waller & McCallum;
Fleming & Associates, L.L.P.; Hopkins Goldenberg, P.C.; Hubbard & Biederman,
L.L.P.; James, Hoyer, Newcomer, Forizs & Smiljanich, P.A.; Law Offices of Charles J.
Piven, P.A.; LeBlanc, Maples & Waddell, LLC; McCallum & Associates; Morris,
Haynes, Ingram & Hornsby; Much Shelist Freed Denenberg Ament Bell & Rubenstein,
P.C.; Perry & Schmucker; Robert G. Methvin, Jr., P.C.; Schiffrin & Barroway, LLP;
Tomerlin Law Office; Whatley Drake, L.L.C.; and White Dunn & Booker. All are
experienced plaintiffs' counsel with expertise in insurance, consumer and class action
litigation. *See* Weiss/Stoia Decl. ¶ 172.

          20.    **Defendants** — The Franklin Life Insurance Company is a stock
life insurance company domiciled in Illinois. It is licensed to issue life insurance
throughout the United States (except the state of New York) and in Puerto Rico.

          21.    The American Franklin Life Insurance Company is a subsidiary of
The Franklin Life Insurance Company. It also is domiciled in Illinois and is licensed to
issue life insurance throughout the United States (except the states of Maine, New
Hampshire, Vermont and New York) and in Puerto Rico.

          22.    American General Corporation is the ultimate parent of both The
Franklin Life Insurance Company and The American Franklin Life Insurance Company.

8

23. **Defendants' Counsel** — Defendants are represented by the firms of Debevoise & Plimpton and Lightfoot, Franklin & White, L.L.C. Both of these firms have extensive experience in the defense of complex and class action litigation.

### E. The Settlement

24. This action was vigorously contested since its filing in September 1996. Defendants removed the action from the Alabama state court to this Court in January 1997. Defendants also moved to dismiss the complaint and for summary judgment. Plaintiff Garst opposed both motions, and the Court denied them. Plaintiff moved to certify the class, and defendants opposed this motion. In addition, the *Dunn* and *Baker* class actions also were being prosecuted and actively litigated by the parties.

25. Franklin initiated settlement discussions with plaintiffs in January 1998. *Id.* ¶ 68; Santillo Decl. ¶¶ 12-13. Initial settlement discussions occurred during January and February, during which the parities discussed, among other things, the general parameters of relief that would be included in any settlement. *Id.* ¶ 17. However, plaintiffs insisted that a settlement could not be achieved until all remaining discovery, including document production and depositions, had been completed. *Id.* ¶ 18; Weiss/Stoia Decl. ¶ 69.

26. Franklin continued to produce, on an expedited basis, a substantial volume of documents soon after settlement discussions began. *Id.* ¶ 71. Franklin

9

produced over 578,000 pages of documents and numerous computer disks, videotapes and audio tapes. Santillo Decl. ¶ 18. The materials were gathered from sources throughout Franklin's home office and included, among other things, policy forms, product advertising, field communications, board of directors minutes, regulatory reviews, illustration software and related policy files for the named plaintiffs. Franklin also provided plaintiffs with transcripts of depositions of current or former company officers and employees taken in other market conduct litigation.

27.    Plaintiffs' counsel also deposed 12 former or current senior executives, managers and members of Franklin's field force. The deponents included the current Vice Chairman; two former Chief Marketing Officers, one of whom is currently a Regional Manager; the current Chief Marketing Officer, who formerly was a sales associate and a Regional Manager; the current and former Chief Actuaries; the current Director of Compliance; and a Vice President of The American Franklin Life Insurance Company. *See* Weiss/Stoia Decl. ¶ 65.

28.    While discovery proceeded, the parties continued their settlement negotiations. There were many meetings, both by telephone and face-to-face, throughout 1998. These meetings were very contentious, and the discussions were often heated. *Id.* ¶¶ 72-79; Santillo Decl. ¶¶ 19-27. Negotiations broke down on more than one occasion. Weiss/Stoia Decl. ¶ 72; Santillo Decl. ¶ 32.

29.     The parties focused on a settlement framework similar to that
adopted in other cases involving life insurance sales practice class actions — *i.e.*, a
framework that would include both an alternative dispute resolution process and relief for
Class Members who did not elect to participate in that process. Weiss/Stoia Decl. ¶ 73;
Santillo Decl. ¶ 15. However, plaintiffs' counsel insisted that, among other things, the
alternative dispute resolution process be significantly streamlined and the general relief
be available to Class Members automatically if they do not elect the alternative dispute
resolution process. Weiss/Stoia Decl. ¶ 73; Santillo Decl. ¶ 17. As a consequence, the
dispute resolution process included in the Settlement was dramatically restructured over
the course of the settlement negotiations. Weiss/Stoia Decl. ¶ 76; Santillo Decl. ¶ 28.

30.     The final terms of the settlement continued to be negotiated up to
the second week of December 1998. Weiss/Stoia Decl. ¶ 80; Santillo Decl. ¶ 31. With
the settlement terms set, an agreement on plaintiffs' attorneys' fees was concluded on
December 15, 1998, and a Stipulation of Settlement was executed. Weiss/Stoia Decl.
¶ 80; Santillo Decl. ¶ 31.

## F.     The December 16, 1998 Hearing and Preliminary Approval Order

31.     On December 16, 1998, the Court held a hearing at which it
preliminary approved the Stipulation of Settlement and directed the parties to send notice
to the Class.

11

32.     The Court entered its Findings and Order, ruling, among other

things, that the Settlement was "sufficiently fair, reasonable and adequate to warrant

sending notice of the Action and proposed settlement" to Class Members.

33.     Consistent with the Court's Order, the parties provided notice of

the proposed Settlement to Class Members. Defendants selected, with Lead Counsel

approval, a settlement administrator, Rust Consulting, Inc. ("Rust"), that arranged for

mailing of individual notices and publication of the summary notice and, in addition,

established a toll-free telephone bank to receive and respond to Class Member inquiries

regarding the class action and proposed Settlement. Dahl ¶¶ 16-18, 30-31.

## G.     First Amendment to the Stipulation of Settlement

34.     In response to objections raised by a Class Member, the parties

executed a First Amendment to the Stipulation of Settlement on May 21, 1999. It was

filed with the Court on May 28, 1999. The Class Member's objection was subsequently

withdrawn.[3]

35.     The First Amendment to the Stipulation of Settlement enhanced

the relief available to Class Members in that it provided for four changes to the

Settlement Agreement. These changes are discussed below.

_____

3.   This objector, Ray Huff, also filed a motion to intervene and a complaint in intervention.
     Subsequent to the execution of the First Amendment to the Stipulation of Settlement, Mr.
     Huff withdrew his motion and his complaint, as well as his objection to the settlement.

12

**H.    The Fairness Hearing**

36.    The parties filed extensive memoranda, declarations, affidavits and reports with the Court prior to the Fairness Hearing. These submissions, which were filed with the Court on May 17, 1999, included numerous declarations and affidavits from fact and expert witnesses.

a.    Plaintiffs presented declarations from: Timothy G. Blood (associate at Milberg Weiss Bershad Hynes & Lerach LLP); Samuel Issacharoff (Professor, Joseph D. Jamail Centennial Chair, at the University of Texas School of Law and Professor, Columbia University); Terry M. Long (Vice President and Principal of Lewis & Ellis, Inc.); John E. Sexton (Dean of the New York University School of Law); Clarence M. Small, Jr. (senior partner at Rives & Peterson); John J. Stoia, Jr. (partner at Milberg Weiss Bershad Hynes & Lerach LLP); and Melvyn I. Weiss and John J. Stoia, Jr. (senior partner/partner at Milberg Weiss Bershad Hynes & Lerach LLP).[4]

b.    Defendants submitted affidavits and declarations from James P. Corcoran (former New York Superintendent of Insurance); Patricia K. Crouch (Associate Director for Client Systems at Franklin); Jeffrey D. Dahl (Senior Vice President and National Director of Claims Administration at Rust); Dale Hagstrom

---

4. Declarations also were submitted by plaintiffs' counsel listed in paragraph 19 above in support of plaintiffs' application for attorneys' fees and expenses.

(Consulting Actuary, Milliman & Robertson, Inc.) attached to which was a report prepared by Milliman & Robertson, Inc.; Robert D. Harrison (Lecturer in Legal Method, Yale Law School); Susan Howard (Vice President of Communications, American General Life Division); Andrew Novak (Vice President, Kinsella Communications, Ltd.); George L. Priest (John M. Olin Professor of Law and Economics at Yale Law School); Dale W. Sachtleben (Vice President of Client Services Division at Franklin); Carl Santillo (Executive Vice President, VALIC, an American General Corporation company); and Leigh Whelan (Senior Attorney, American General Corporation).

37.     The parties' submissions also responded to the 34 objections raised by Class Members regarding the Settlement.

38.     The Court held a hearing regarding the fairness, adequacy and reasonableness of the Settlement Agreement on June 1, 1999.

39.     Both plaintiffs' counsel and defendants' counsel made presentations in support of the Settlement at the June 1 hearing. No Class Members asked to be heard at the hearing.

40.     At the end of the Fairness Hearing, the Court found that the proposed Settlement is fair, reasonable and adequate. The Court therefore signed a Final Judgment and an Order Approving the Class Action Settlement. Pursuant to the Order, the complaint in this action was dismissed with prejudice.

14

## II. THE TERMS OF THE SETTLEMENT

41. The Settlement provides the Class with a substantial and

innovative package of relief responsive to the allegations raised in the complaint. Though

this Settlement has some similarities to court-approved settlements reached in class

actions involving other large insurance companies,[5] the Settlement is unique in many

respects, including the Claim Evaluation Process, which is specifically tailored to meet

the needs of the Class in this case.

42. The Settlement provides two alternative types of relief: General

Policy Relief and the Claim Evaluation Process ("CEP"), including the Part VIII

Alternative Dispute Resolution ("ADR") Process.

---

5. *E.g.*, *Willson v. New York Life Ins. Co.*, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup. Ct. Feb. 1, 1996), *aff'd*, 644 N.Y.S.2d 617 (App. Div. 1996), *appeal denied*, 677 N.E.2d 289 (N.Y. 1997), *cert. dismissed*, 521 U.S. 1112 (1997); *Michels v. Phoenix Home Life Mut. Ins. Co.*, 1997 N.Y. Misc. LEXIS 171 (N.Y. Sup. Ct. Jan. 3, 1997); *Natal v. Transamerica Occidental Life Ins. Co.*, No. 694829 (Cal. Super. Ct., San Diego County, July 28, 1997); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (D.N.J. 1997), *aff'd in part, vacated and remanded in part*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 119 S. Ct. 890 (1999); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54 (D. Mass. 1997), *aff'd*, No. 98-1901 (1st Cir. Dec. 1, 1998), *petition for cert. filed*, __ U.S.L.W ____ (U.S. Apr. 28, 1999); *Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741 (M.D. Fla. Jan. 27, 1998); *Ace Seat Cover Co. v. Pacific Life Ins. Co.*, No. 97-CI-00648 (Ky. Cir. Ct., Kenton County, Nov. 19, 1998); *In re Manufacturers Life Ins. Co. Premium Litig.*, No. 96-CV-230 BTM (AJB) (S.D. Cal. Dec. 21, 1998).

15

## A. General Policy Relief

43.     As described in detail in the Settlement Agreement, the Settlement provides three forms of General Policy Relief to each Class Member who chooses not to submit a claim to CEP: (*i*) the General Benefit, (*ii*) Settlement Scrip and (*iii*) the Prospective Commitment. Class members will receive this relief automatically and without any evidence of wrongdoing or damages.

44.     **The General Benefit** — The General Benefit will provide two benefits: (*i*) the Settlement Death Benefit, which provides a new death benefit for 12 to 59 months; and (*ii*) the Accidental Death Benefit, which will begin automatically after the end of the Settlement Death Benefit and will provide from 12 to 59 months of an accidental death benefit. The General Benefit will be provided automatically and without cost to all Class Members who do not elect CEP.

45.     **Settlement Scrip** — In addition to receiving the General Benefit, Class Members who do not choose CEP will automatically be able to use Settlement Scrip to buy a new life insurance policy to which Franklin will contribute 100% of the first year premium over the first two years of the policy. Settlement Scrip will be freely transferable and, as specifically set out in the First Amendment to the Stipulation of Settlement, Franklin will set up a website at which Class Members and others will be able

to post messages or other information regarding transferring or obtaining Scrip. Lead
Counsel also will provide a hyperlink to the Scrip website on Lead Counsel's website.

46.     With respect to the transfer of Settlement Scrip and the right to
designate another person as eligible to receive the General Benefit, the Court finds that, to
the extent the opportunity (*i*) to transfer Settlement Scrip or (*ii*) to designate another
person as eligible to receive the General Benefit under the Settlement constitutes the offer
or sale of a security under the Securities Act of 1933, 15 U.S.C. §§ 77a *et. seq.*, the
Court's approval of the terms and conditions of the Settlement will exempt the transfer or
designation (or opportunity to transfer or designate) from registration under the 1933 Act
pursuant to section 3(a)(10) of that Act, which exempts securities "issued in exchange for
one or more bona fide . . . claims." 15 U.S.C. § 77c(a)(10).

47.     **Prospective Commitment** — Pursuant to this commitment (which
was added to the Settlement as a result of the May 21, 1999 First Amendment to the
Stipulation of Settlement), Franklin has agreed that, for one year following July 1, 1999,
it will refund to all Class Members receiving General Policy Relief any increase over
scheduled cost-of-insurance charges or any decrease in dividends due to mortality
experience. As with the General Benefit, this relief will be provided automatically and
without cost to all Class Members who receive General Policy Relief.

17

**B.     Individualized Relief**

48.     As described in more detail in the Settlement Agreement, the

Settlement also allows any Class Member who believes he or she was misled by a

misstatement or omission of material information, or was otherwise harmed in connection

with his or her policy, to seek an award through an individualized alternative dispute

resolution process.  Depending on its nature, a Class Member's claim will be reviewed

through one of two processes:  CEP or the Part VIII ADR Process.

49.     **The Claim Evaluation Process** — CEP will be used to evaluate

claims relating to the key sales practice allegations contained in the complaint — Limited

Premium Payment Claims (including "fully paid-up" claims), Performance Claims,

Replacement Claims and Retirement Claims.  The claims will be evaluated by a Claim

Evaluator, who will be selected by Lead Counsel.  Franklin will pay $1.25 million to

cover the administrative costs of CEP, including the Claim Evaluator's fees and

expenses.

50.     The Claim Evaluator will designate claims as level three, level

two, level one or level zero claims based on the nature and strength of the claim, with

level three claims receiving the highest level of relief and level zero claims receiving no

relief.[6] Successful CEP claimants will receive cash awards tailored to the harms suffered and damages incurred. *See* Priest Aff. ¶ 32 ("[t]he restitutionary relief provided by [CEP] mirrors the substantive allegations of the class"). These cash awards will have no restrictions limiting, or requirements regarding, how Class Members may use the awards.

51.     CEP features a number of substantive and procedural protections for claimants, including that (*i*) the Claim Evaluator will review claims using detailed, objective criteria approved by the Court, (*ii*) Franklin will assemble a Claim File that includes information from its files on the policy(ies) at issue, (*iii*) Franklin will not be able to raise defenses (*e.g.*, statutes of limitations, the parol evidence rule and the statute of frauds) or evidentiary objections it could have asserted against claimants in litigation and (*iv*) the Claim Evaluator may utilize the evidence uncovered as part of plaintiffs' discovery as applicable to any particular claim(s). In addition, the Claim Evaluator will have discretion to adjust the scoring and/or awards of relief for claims to reflect the circumstances or injuries suffered by a particular claimant(s). The Claim Evaluator may also in his or her discretion consider a range of factors unique to Franklin's alleged

---

6. As originally set out in the Stipulation of Settlement, a claim would be designated a level zero claim if there was documentary evidence contradicting the Class Member's claim. As part of the First Amendment to the Stipulation of Settlement, this provision was eliminated. Thus contradictory documentary evidence alone will no longer cause a claim to be designated as a level zero claim. Only claims based on blank or otherwise deficient claim forms will be designated as level zero claims.

19

misconduct. As noted by Franklin's expert, James Corcoran, a former New York
Superintendent of Insurance: "[T]he CEP Guidelines are designed to provide for a fair
resolution of the four primary sales practice claims made in this case." Corcoran Aff.
¶ 25. Similarly, plaintiffs' expert, John E. Sexton, Dean of the New York University
School of Law, has concluded that CEP "will be fast and efficient while ensuring that all
interests are represented." Sexton Decl. ¶ 25.

52.     The Claim Evaluator's decision will be final, binding and not
subject to review or appeal.

53.     **The Part VIII ADR Process** — The Part VIII ADR Process
provides a forum for resolving claims that were submitted by the Election Date (as
defined in the Settlement Agreement) but do not fall within one of the four categories of
claims identified above (*see* ¶ 49; Ex. A to the Settlement Agreement). In addition, a
Class Member may require Franklin to resolve in the Part VIII ADR Process any policy
servicing or administration claim that arose during the Class Period, even if the claim was
not submitted by the CEP deadline, as long as the Class Member can demonstrate that,
despite exercising reasonable care, he or she did not know and could not have known of
the claim by the Election Date. The Settlement also allows Franklin to require Class
Members to resolve certain other policy-related claims, including pending litigation and

regulatory proceedings, through the Part VIII ADR Process if they did not elect to
exclude themselves from the Settlement.

54.    Claims submitted by the Election Date that do not fall within the
claim categories identified above (*see* ¶ 49 above), but that otherwise relate to Sales
Practices (as defined in Exhibit A to the Stipulation of Settlement), will be reviewed by
the Claim Evaluator pursuant to the CEP procedures. For all other claims, the Part VIII
ADR Process provides a two-tiered resolution system: (*i*) review by a team of three
company representatives in accordance with objective scoring and relief criteria set out in
the Settlement and approved by the Court[7] and (*ii*) an appeal at the discretion of Class
Member (but *not* Franklin) to a panel of independent arbitrators (chosen by Lead
Counsel), who will review the claim de novo using the same objective, Court-approved
scoring and relief criteria. Franklin will pay all of the costs associated with the Part VIII
ADR Process, including the arbitrators' fees and expenses.

55.    As with CEP, the relief in the Part VIII ADR Process has been
designed to correspond to the nature of each claim and the information gathered in
support of it. In addition, the Part VIII ADR Process provides Class Members with

---

7. As part of the First Amendment to the Stipulation of Settlement, the Settlement
Agreement was amended to provide an enhanced opportunity to receive the highest level
of relief under the Part VIII ADR Process without documentation.

numerous procedural and substantive protections, including Franklin's waiver of defenses otherwise available in litigation.

56.     The arbitrators' decision will be final, binding and not subject to review or appeal (except to the limited extent specified in the Settlement Agreement).

## C.     The Release

57.     In exchange for the benefits provided by the Settlement, the Settlement Agreement contains a release that bars Class Members from asserting in any other lawsuit or proceeding any of the claims that have been or could have been asserted in this action. The release (set out in full in the Stipulation of Settlement (pp. 54-59) and reprinted in Appendix A to the individual notice mailed to Class Members) is included in the Court's Final Order.

## D.     Value of the Relief

58.     The parties' expert actuaries have valued the General Benefit portion of the General Policy Relief that will be provided to Class Members at $50.1 million. Milliman & Robertson ("M&R") Report (attached as Ex. A to Hagstrom Decl.) at 30; Long Decl. ¶ 12(b). The actuaries also have concluded that for every 1% of Class Members who use Settlement Scrip, an additional $9.3 million in economic value will be provided to the Class. M&R Report at 30; *see* Long. Decl. ¶ 12(d). Thus, if 5% of the

22

Class utilize Scrip, the Class will receive an additional $46.5 million in economic value; if 100% of the Class utilize Scrip, the Class will receive an additional $630 million.

59.     Under the Settlement Agreement, Franklin has agreed to provide up to $40 million (plus interest) to be disbursed through CEP.[5]  Under the agreement, once all CEP claims have been finally resolved, the total amount of relief awarded to the Class will be calculated.  If that total is less than $40 million, the difference between $40 million (plus accrued interest) and the amount paid to claimants will be distributed to the Class through increases to the Settlement Death Benefit and to CEP awards.  If that total is more than $40 million (plus interest), CEP awards will be proportionately reduced. The parties' expert actuaries have concluded that, based on, among other things, the number of Class Members who have elected CEP and the demographics of those Class Members electing CEP, the total CEP relief awarded in this case should not exceed $37.6 million.  M&R Report at 32; *see* Long Decl. ¶¶ 34-35.  The actuaries also have concluded that, even in the unlikely event individual CEP benefits have to be reduced, "the relief provided to individual CEP claimants would still be substantial and reasonably related to perceived damages."  M&R Report at 39.

---

5.  Under the settlement agreement, a portion of the $40 million also may be used to pay any CEP administration costs not covered by the additional $1.25 million that Franklin will pay specifically to cover such costs.

60.     The Court finds that the Settlement will provide at least $90.1 million in economic value to the Class. This sum does not include the additional economic value that the class will receive from Settlement Scrip, the Prospective Commitment and the Part VIII ADR Process.

61.     Pursuant to a March 31, 1999 Escrow Agreement between the company and Bankers Trust Company, Franklin established an escrow fund for the purpose of satisfying a portion of its obligations under the Settlement Agreement. The Court approves this escrow fund as a "qualified settlement fund" under I.R.C. Reg. § 1.468B-1. Nothing in the Escrow Agreement shall alter any of Franklin's obligations under the Settlement Agreement, including its obligations to (*i*) the Class or (*ii*) Lead Counsel.

## III.     JURISDICTION

### A.     Subject Matter Jurisdiction

62.     This Court possesses federal question jurisdiction, 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331, over the subject matter of this action pursuant to the plaintiffs' claims based on conduct in violation of federal law, 18 U.S.C. § 1962(c).

63.     The existence of federal question jurisdiction over the section 1962(c) claims authorizes the Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over the remaining state law claims, which derive from the same "common

nucleus of operative fact" as the federal law claims. *See, e.g., Lucero v. Trosch*, 121 F.3d 591, 597 (11th Cir. 1997) (section 1367 "confers supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim") (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 724-25 (1966)).

       64.    The Court additionally possesses diversity jurisdiction under 28 U.S.C. § 1332. Complete diversity exists between each named plaintiff and the defendants, and each plaintiff and Class Member has pleaded an amount in controversy of more than $75,000. [Comp. ¶ 6] In any event, the Court would have diversity jurisdiction even if only one named plaintiff satisfied the amount in controversy. *See Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 930-33 (7th Cir. 1996); *In re Abbott Lab.*, 51 F.3d 524, 527-29 (5th Cir. 1995); *Warren v. Playmobil U.S.A., Inc.*, 1996 U.S. Dist. LEXIS 22191, at *5-6 (N.D. Ala. Mar 19, 1996); *Kizzire v. General Motors Corp.*, No. CV 95-B-1322-J, slip op. at 4-5 (N.D. Ala. Mar 19, 1996).

### B.    Personal Jurisdiction

       65.    The Court has personal jurisdiction over the plaintiffs and Class Members from Alabama because those persons have minimum contacts with this forum. The Court also has personal jurisdiction over out-of-state Class Members because, as discussed in more detail below, proper notice has been provided to them and they have been given a chance to opt out or to be heard. *See, e.g., Phillips Petroleum Co. v. Shutts*,

472 U.S. 797, 811-12 (1985); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148
F.3d 283, 306 (3d Cir. 1998), *cert. denied*, 119 S. Ct. 890 (1999).

      66.     The Court therefore finds that all Class Members who did not
request exclusion from the Class by the April 27, 1999 deadline are subject to this
Court's personal jurisdiction. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. at 812.

## IV.   NOTICE TO CLASS MEMBERS

      67.     In its December 16, 1998 Order, the Court found that the
individual notice to be provided to Class Members, the mailing procedures for mailing
and remailing the individual notice, and the summary publication notice constituted "the
best practicable notice" and were "reasonably calculated, under the circumstances, to . . .
meet the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P.
23(c) and (e)) the United States Constitution (including the Due Process Clause), the
Rules of this Court, and any other applicable law." Based on the findings set forth below,
the Court affirms these conclusions.

      68.     Approximately 1,059,000 individual notices were mailed by first-
class mail to current and former policyowners at their last-known addresses between
January 27 and March 2, 1999. Dahl Decl. ¶¶ 16-18. In addition, copies of individual
notices were mailed to 23 attorneys known to represent Class Members in litigation
against defendants. *Id.*; Whelan Decl. ¶ 4. The notice was accompanied by, among other

things, a cover letter summarizing the notice, a question-and-answer brochure responding

to anticipated questions about the case and the proposed Settlement, two "fact sheets"

describing in greater detail the various forms of settlement relief and individualized forms

regarding the settlement benefits available to the Class Member (collectively, the "notice

package"). Dahl Decl. ¶ 8 & Ex. A. Through May 2, 1999, Rust remailed notice

packages returned with a forwarding address, as well as notice packages for which either

of the two search firms retained by Rust was able to provide updated address information.

*Id.* ¶¶ 21-24.

           69.     The notice package included, among other things, (*i*) the case

caption; (*ii*) a description of the litigation; (*iii*) a description of the settlement Class;

(*iv*) identification of counsel for the Class; (*v*) a description of the proposed Settlement,

including the relief available; (*vi*) the full text of the release to be given Franklin; (*vii*) the

date and time of the Fairness Hearing; (*viii*) information about entering an appearance at

the Fairness Hearing individually or through counsel; (*ix*) the procedure and deadline for

filing objections; (*x*) the manner in which Class Members could obtain access to

discovery materials produced in the lawsuit; (*xi*) the procedure and deadline for filing

requests for exclusion; (*xii*) the consequences of requesting exclusion; (*xiii*) the

consequences of remaining in the settlement Class; (*xiv*) a description of Franklin's

responsibility for plaintiffs' attorneys' fees and expenses; (*xv*) a description of the

preliminary injunction issued by the Court; and (*xvi*) the procedure for obtaining

additional information, including the toll-free telephone number established to respond to

Class Member inquiries.

70.    The notice package provided to Class Members contains clear and

comprehensive documents that present, in a reader-friendly format, detailed and accurate

information about the lawsuit, the proposed Settlement and the options available to Class

Members. Harrison Aff. ¶ 11; p. 35; Priest Aff. ¶ 24; Corcoran Aff. ¶ 18; Sexton Decl.

¶ 9. The notice package in this case is quite similar to the notice package considered by

the United States Court of Appeals for the Third Circuit in *In re Prudential Ins. Co. of

Am. Sales Practices Litig.* That court found that "the provision of individual notice to

each class member is by no means typical of the notice provided in most class actions,

and certainly qualifies as unprecedented." *In re Prudential Ins. Co. of Am. Sales

Practices Litig.*, 148 F.3d at 306.

71.    In addition to providing the individual notice described above, the

parties published a summary notice on March 8 or 9, 1999 in *The Wall Street Journal*

(national edition), *The New York Times* (national edition), *USA Today*, *The Chicago

Tribune*, *The Birmingham News Post Herald*, and the newspapers with the highest

circulation in each of the remaining 48 states, the District of Columbia and San Juan,

Puerto Rico. Novak Decl. ¶ 4 & Ex. A. The summary notice also was published on The

Franklin Life Insurance Company's internet website and Lead Counsel's website.
Howard Decl. ¶ 3; Weiss/Stoia Decl. ¶ 133.

72.    The summary notice included, among other things, (*i*) the case
caption; (*ii*) a description of the settlement Class; (*iii*) a brief description of the proposed
Settlement; (*iv*) identification of counsel for the Class; (*v*) the date and time of the
Fairness Hearing; (*vi*) information about appearing at the Fairness Hearing; (*vii*)
information about and the deadline for filing objections to the Settlement; (*viii*)
information about and the deadline for filing requests for exclusion; (*ix*) the consequences
of requesting exclusion; (*x*) the consequences of remaining in the settlement Class; (*xi*) a
description of Franklin's responsibility for plaintiffs' attorneys' fees and expenses; (*xii*) a
description of the preliminary injunction issued by the Court; and (*xiii*) the procedure for
obtaining additional information, including the toll-free telephone number established to
respond to Class Member inquiries regarding how they could obtain an individual notice
package.

73.    The Court finds that the publication notice provided to Class
Members is a clear and comprehensive summary of the proposed Settlement that presents
detailed and accurate information about the lawsuit, the terms of the Settlement and the
options available to Class Members.

74.     At the parties' direction, Rust also established The Franklin Life
Class Action Information Center, including, among other things, a toll-free telephone
bank to respond to Class Member inquiries. Dahl Decl. ¶ 31. The toll-free number was
included both in the individual class notice and in the published summary notice and both
notices informed Class Members that, if they had any questions about the Settlement,
they should call the toll-free telephone number. The Class Action Information Center
was staffed with individuals who were trained by the parties to answer Class Member
questions. *Id.* ¶ 35. As of May 3, 1999, the telephone bank had responded to over 65,575
policyowner inquiries. *Id.* ¶ 47. Plaintiffs' counsel was on site at the Class Action
Information Center to participate in the day-to-day operation of the center, to monitor
Class Member's conversations with the operators and to speak directly with Class
Members. Weiss/Stoia Decl. ¶ 137. As of May 5, 1999, plaintiffs' counsel had spoken
directly with over 13,212 Class Members and monitored over 9,753 calls between the
operators and Class Members. *Id.*

75.     Based upon its review of the individual and publication notice
materials and expert testimony concerning those materials, the Court concludes that the
best practicable notice was given to the Class in this case and that the notice was
reasonably calculated (*i*) to describe the action and the plaintiffs' rights in it and (*ii*) to
apprise interested parties of the pendency of the action and of their right either to exclude

30

themselves from the Class or to appear and object to the Settlement. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. at 810; *accord In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435, 1449 (9th Cir. 1987), *rev'd on other grounds*, 490 U.S. 93 (1989). In determining that the best practicable notice was provided to Class Members, the Court has considered that amendments were made to the Stipulation of Settlement after notice was mailed and published. Because these amendments enhance the relief provided to Class Members, the Court finds that additional notice was not and is not necessary. The notice previously sent to Class Members remains the best practicable notice that could have been given to Class Members and is consistent with constitutional standards.

76.     The Court thus affirms its finding and conclusion in the December 16, 1998 Order that the notice in this case meets the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Rules of this Court, and any other applicable law.

## V.     CLASS CERTIFICATION

77.     In its December 16, 1998 Order, the Court preliminarily certified the Class for settlement purposes. Plaintiffs argue that final certification of this action is both appropriate and warranted. Weiss/Stoia Decl. ¶¶ 167-74. Defendants have taken no position on the certification of a class action as part of this Settlement. The Court makes

the following findings in support of its decision to grant final certification of the Class for settlement purposes, which are intended to supplement and finalize the certification findings made by this Court in its December 16, 1998 Order.

       78.    In order to certify this settlement class, the Court must find that the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a) — numerosity, commonality, typicality and adequacy of representation — and, in addition, is maintainable under Rule 23(b)(3). The Rule 23(b)(3) requirements are that common questions "predominate over any questions affecting only individual members" and that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy."

       79.    In *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 618 (1997), the Supreme Court expressly acknowledged that cases may be certified for settlement purposes only. In doing so, the Supreme Court stated that the "dominant concern" on which a court should focus in deciding whether to certify a class is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* at 621. The Court further held that, when the question of certification is raised in connection with a class action settlement, "settlement is relevant to a class certification," *id.* at 619, and "must be considered as a factor in the calculus," *Id.* at 622.

80.    **Numerosity** — There is no question that the class proposed in this case — which has approximately 900,000 Class Members living across the nation — meets the numerosity requirement. *E.g.*, *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1981) (generally, more than 40 class members satisfy numerosity), *cert. denied*, 479 U.S. 883 (1986).

81.    **Commonality** — The commonality requirement is satisfied when the members of a proposed class share at least one common factual or legal issue. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986); *Kreuzfeld A.G. v. Carnehamar*, 138 F.R.D. 594, 599 (S.D. Fla. 1991); Herbert Newberg & A. Conte, 1 *Newberg on Class Actions* § 3.10, at 3-51 to -52 (3d ed. 1992); 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.23[2] (3d ed. 1999).  This requirement thus is satisfied when plaintiffs allege common or standardized conduct by the defendant toward members of the proposed class. *See Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983); *accord In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. at 511 (collecting cases); *Seidman v. American Mobile Sys., Inc.*, 157 F.R.D. 354, 366 (E.D. Pa. 1994) (allegations of ongoing course of conduct satisfied commonality requirement).

82.    In this case, the complaint (¶ 143) alleges over 35 factual and legal issues common to the Class, including whether Franklin "devised and deployed a scheme or artifice to defraud or engaged in a common course of business which acted to defraud

or deceive plaintiffs and the Class," and whether Franklin "routinely engaged in fraudulent and deceptive acts and practices and courses of business in the sale of its policies." The commonality requirement is thus satisfied.

83. **Typicality** — Typicality is satisfied when the named plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims, and when the plaintiff's claims and those of the class are based on the same legal theory. *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *Powers v. Stuart-James Co.*, 707 F. Supp. 499, 503 (M.D. Fla. 1989). Slight factual differences that may exist between the class representatives and other Class Members will not defeat typicality. *Appleyard v. Wallace*, 754 F.2d at 958.

84. The typicality requirement is satisfied in this case because the named plaintiffs allege claims that arise from the same alleged course of conduct that purportedly harmed all Class Members and are based on the same legal theories. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. at 518 (typicality requirement met in case alleging replacement, vanishing premium and investment plan claims, because defendants' alleged scheme to defraud was "prominent guiding thread through all of the plaintiffs' claims"); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. at 63 (typicality requirement met where "named plaintiffs were subjected to the

34

same deceptive sales techniques allegedly used by [defendants] against other class members"); *see also* Priest Aff. ¶ 19.

85. **Adequacy of Representation** — Rule 23(a)'s adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods, Inc. v. Windsor*, 521 U.S. at 625 (citations omitted). This requirement is met when (*i*) the named class representatives appear to be capable of prosecuting the action through qualified, experienced and competent counsel and (*ii*) there is no antagonism or disabling conflict between the interests of the named class representatives and the interests of the class members. *E.g.*, *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.) (citation omitted), *cert. denied*, 485 U.S. 959 (1987). In this case, both of these requirements are easily met.

86. The named class representatives have engaged competent counsel. Lead Counsel in this case, Milberg Weiss Bershad Hynes & Lerach LLP, is a firm of national stature, experienced in the litigation and settlement of large, nationwide class actions. Lead Counsel and the other firms representing the Class in this case are clearly qualified to conduct this action. *See generally* Weiss/Stoia Decl. ¶ 172. In addition, plaintiffs' counsel have vigorously conducted this litigation from the outset — opposing defendants' motions to dismiss and motion for summary judgment, filing a motion to certify the class, demanding and receiving from defendants extensive documents covering

all of the substantive issues and deposing 12 current or former Franklin employees. The
settlement negotiations in this case were long and protracted. Only after plaintiffs'
counsel had finished their discovery and satisfied themselves that they had procured the
best possible settlement for the Class was an agreement reached. The Class thus had
more than adequate legal representation. *See* Priest Aff. ¶ 21.

        87.    There are no conflicts of interest or other antagonisms between
plaintiffs and other Class Members that would impair the representative plaintiffs'
incentive to prosecute vigorously all aspects of the claims against Franklin. *See*
Issacharoff Decl. ¶¶ 19, 34-35. The named representatives have the same incentive as
other Class Members who believe they were deceived: to establish the alleged fraud and
to maximize the overall recovery. *See In re Corrugated Container Antitrust Litig.*, 643
F.2d 195, 208 (5th Cir. 1981) ("so long as all class members are united in asserting a
common right, such as achieving the maximum possible recovery for the class, the class
interests are not antagonistic for representation purposes") (internal citation omitted). In
addition, it is clear that the settlement — which is relevant to determining whether there
is adequate representation of absent Class Members, *see Amchem Prods, Inc. v. Windsor*
521 U.S. at 621 — benefits the Class and does not involve any sacrifice of the interests of
some Class Members for those of others. Issacharoff Decl. ¶¶ 36-37. Finally, the
extremely low number of requests for exclusion (less than 0.5% of Class policies) and

objections (34 objections submitted on behalf of 41 Class Members) confirms that the interests of the named plaintiffs and of Class Members are closely aligned and that the vast majority of Class Members believe that their interests have been well served.

88.    **Predominance of Common Questions** — The predominance requirement in Rule 23(b)(3) focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem Prods, Inc. v. Windsor*, 521 U.S. at 623. This requirement "requires a *predominance* of common questions, not a *unanimity* of them." *Hanrahan v. Britt*, 174 F.R.D. 356, 365 (E.D. Pa. 1997 (emphasis added; citation omitted). This requirement is thus "not defeated by slight differences in class members' positions." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976); *accord Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d at 725; *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. at 510-11; *Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741, at *15.

89.    The predominance requirement is satisfied when "the litigation will concern 'similar or standardized oral representations contain[ing] significant legal and factual questions which are common to the class.'" *Hanrahan v. Britt*, 174 F.R.D. at 365 (quotation omitted); *see also In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.) (even a few common issues may satisfy the predominance requirement if resolution

of issues "will so advance the litigation that they may fairly be said to predominate"),

*cert. denied*, 479 U.S. 852 (1986). When confronted with a class of purchasers allegedly

defrauded over a period of time by a similar common thread or scheme to which all

alleged non-disclosures or misrepresentations relate, "courts have taken the common

sense approach that the class is united by a common interest in determining whether a

defendant's course of conduct is in its broad outlines actionable, which is not defeated by

slight differences in class members' positions, and that the issue may profitably be tried

in one suit." *Blackie v. Barrack*, 524 F.2d at 892; *accord Kirkpatrick v. J.C. Bradford &*

*Co.*, 827 F.2d at 725. A claim will meet the predominance requirement when there

exists generalized evidence which proves or disproves an element on a simultaneous,

classwide bases, since such proof obviates the need to re-examine each class member's

individual position. *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995);

*see also* Issacharoff Decl. ¶ 12.

     90.    As noted above, in their complaint (¶ 143), plaintiffs allege over 35

factual and legal issues common to the Class. These allegations relate to whether

Franklin uniformly failed to disclose material information relating to policy dividends,

interest credits and values, whether Franklin developed a common scheme for

fraudulently inducing Class Members to purchase insurance, and whether Franklin

implemented any such scheme by training agents to use uniformly deceptive sales

techniques and by providing agents with uniformly deceptive sales materials and policy illustrations to be used with prospective purchasers. Resolution of these issues will clearly "so advance the litigation that they may fairly be said to predominate." *In re School Asbestos Litig.*, 789 F.2d at 1010.

91.     In this case, plaintiffs' allegations of a common scheme of deception are sufficient to demonstrate that common questions predominate. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met") (quoting *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)); *see also Amchem Prods, Inc. v. Windsor*, 521 U.S. at 675 ("[p]redominance is a test readily met in certain cases alleging consumer . . . fraud"); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 314 (case "involving a common scheme to defraud millions of life insurance policy holders" falls within the category of cases that satisfy the predominance requirement).

92.     The Court recognizes that differing state laws might have applied to certain of plaintiffs' claims had this case been tried. Of course, plaintiffs' claims under federal law involve a common body of law. Even as to state law claims, however, the possible existence of such variations does not defeat a finding of predominance. In a

nationwide insurance sales practice class action involving the same types of claims and

legal questions as those at issue here, the United States Court of Appeals for the Third

Circuit held that any variations in state law did not defeat the district court's finding that

common issues predominated over individual ones because the potential variations

"could be overcome at trial by grouping similar state laws together and applying them as

a unit." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 315; *see also*

Issacharoff Decl. ¶¶ 30-32.

93.    Finally, the Court notes that, to the extent any variations in state

law would suggest that the case might not be readily manageable as a class action, that is

an issue that the Supreme Court has specifically stated a court need *not* consider in

determining whether a class should be certified for settlement purposes. *Amchem Prods,*

*Inc. v. Windsor*, 521 U.S. at 620.

94.    The Court therefore finds that common issues of law and fact

predominate.

95.    **Superiority** — Matters pertinent to a finding of superiority

include:

(A) the interest of members of the class in individually controlling the
prosecution or defense of separate actions; (B) the extent and nature of any
litigation concerning the controversy already commenced by or against
members of the class; (C) the desirability or undesirability of
concentrating the litigation of the claims in the particular forum; (D) the
difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

a.          **Interests of Individual Members** — The interest of class

members in conducting separate lawsuits does not require denial of class certification

when a large number of the claims class members would have would be so small that

class members would be deterred from bringing actions on their own. *See, e.g., Duhaime*

*v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. at 64; *In re Prudential Ins. Co. of Am.*

*Sales Practices Litig.*, 962 F. Supp. at 523. As the Supreme Court recently emphasized:

> The policy at the very core of the class action mechanism is to overcome
> the problem that small recoveries do not provide the incentive for any
> individual to bring a solo action prosecuting his or her rights. A class
> action solves this problem by aggregating the relatively paltry potential
> recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Prods, Inc. v. Windsor*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*,

109 F.3d 338, 344 (7th Cir. 1997)). In addition, because Class Members who wished to

pursue their own lawsuit could have requested exclusion, no Class Member was

precluded from conducting a separate lawsuit if he or she so desired. Moreover, the

interest of Class Members in pursuing their individual claims is actually advanced by the

settlement class proposed in this case because the Settlement itself provides an efficient

and cost-free means for Class Members to present individual claims and obtain

individualized determinations whether their claims merit relief and, if so, at what level.

41

b.      **Pending Proceedings** — There are only 14 individual

lawsuits pending against Franklin relating to the sales practices at issue in this case.

Weiss/Stoia Decl. ¶ 137. This number is very small in comparison to the large number of

Class Members who will benefit from this Settlement. Those 14 actions will not,

separately or collectively, result in an adjudication of the controversy that underlies this

class action. Moreover, as discussed above, plaintiffs in three putative class actions

against Franklin have become representative plaintiffs in this action.

c.      **Concentration of Litigation in One Forum** — Because

this case will be settled (not tried), the desirability of concentrating the litigation in a

particular forum is consistent with certification. Moreover, it clearly is more efficient to

have these claims resolved in one forum, regardless of whether the case is settled or not.

d.      **Manageability** — Given the Supreme Court's holding that

a court certifying a settlement class need not decide whether or not a class action would

be manageable at trial, *Amchem Prods, Inc. v. Windsor*, 521 U.S. at 620, this Court need

not consider the issue of manageability. It is nevertheless worth noting that the proposed

Settlement resolves any manageability problems that would have been present if

settlement had not been achieved by creating a mechanism for reviewing the individual

claims of Class Members. The Settlement Agreement thus permits what may be a sizable

number of Class Members to achieve individual relief without burdening the judicial

42

system and thus "result[s] in a large saving of judicial resources." *See Margaret Hall Found., Inc. v. Atlantic Fin. Management, Inc.*, 1987 U.S. Dist. LEXIS 7528, at *15 (D. Mass. July 30, 1987).

96.     Based on the above, the Court grants final certification of the settlement class in this case.

## VI.     FAIRNESS OF THE SETTLEMENT

97.     In considering whether to approve the proposed Settlement under Federal Rule of Civil Procedure 23(e), the Court must determine whether the Settlement is "fair, adequate and reasonable and . . . not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).  The factors that the Court should consider are

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

98.     The Court's assessment of these factors should be "informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Id.* at 986; *accord Cotton v. Hinton*, 559 F.2d

at 1331 ("[p]articularly in class action suits, there is an overriding public interest in favor

of settlement").

          99.     **Plaintiffs' Likelihood of Success at Trial** — In assessing

plaintiffs' likelihood of success at trial for purposes of determining whether the

Settlement is fair, adequate and reasonable, the Court should make only a "limited

inquiry into whether the possible rewards of continued litigation with its risks and costs

are outweighed by the benefits of the settlement." *Ressler v. Jacobson*, 822 F. Supp.

1551, 1553 (M.D. Fla. 1992); *accord Cotton v. Hinton*, 559 F.2d at 1330 ("in evaluating

the terms of the compromise in relation to the likely benefits of a successful trial, the trial

judge ought not try the case [on the merits] in the settlement hearings"); *Mashburn v.

National Healthcare, Inc.*, 684 F. Supp. 660, 670 (M.D. Ala. 1988) (in the class action

settlement context, courts "do not decide the merits of the case or resolve unsettled legal

questions") (citations omitted).

          100.    Furthermore, although the Court has considered the effect of

possible variations in state law in certifying the Class, it has neither made, nor is required

to make, any choice of law determination in assessing the obstacles plaintiffs might face

at trial. *See Michels v. Phoenix Home Mut. Life Ins. Co.*, 1997 N.Y. Misc. LEXIS 171, at

*51-52, *Willson v. New York Life Ins. Co.*, 1995 N.Y. Misc. LEXIS 652, at *41; *Bowling

v. Pfizer, Inc.*, 143 F.R.D. 141, 167-68 (S.D. Ohio 1992).

101. The Court notes that, defendants' submission [at 32-36] raises a number of potential legal and factual obstacles that plaintiffs would have faced if this litigation had proceeded to the merits, including that (*i*) plaintiffs' claims of misrepresentations would be contradicted by the language of the policies themselves; (*ii*) alleged promises of future conduct or expressions of opinion cannot support misrepresentation claims; (*iii*) the economic loss doctrine bars plaintiffs' tort claims; and (*iv*) plaintiffs' claims would have to overcome statutes of limitations, parol evidence and statute of frauds defenses. Plaintiffs acknowledge in their submission [at 30] that these defenses are "potentially formidable."

102. The existence of these (and other) potential obstacles to plaintiffs' success on the merits argues in favor of approving the settlement. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538-39 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 823-24 (D. Mass. 1987).

103. **Range of Possible Recovery and Reasonableness of Settlement Amount** — The second and third factors in the Eleventh Circuit's *Bennett* analysis call for the Court to determine "the possible range of recovery" and then ascertain where within that range "fair, adequate, and reasonable settlements lie." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. at 541-42; *accord Bennett v. Behring Corp.*, 737 F.2d at 986.

104.    There is no fixed point above or below which a settlement is or is

not fair. Indeed, "[t]he fact that a proposed settlement may only amount to a fraction of

the potential recovery does not, in and of itself, mean that the proposed settlement is

inadequate; there is no reason why a satisfactory settlement could not amount to a

hundredth or even a thousandth part of a single percent of the potential recovery." *TBK*

*Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 463-64 (2d Cir. 1982) (internal

quotation marks omitted).

105.    The parties' experts have opined that the relief package will

provide *at least* $90.1 million in economic value to the Class.  M&R Report at 30; Long

Decl. ¶ 12.

106.    Class Members who elect General Policy Relief automatically will

receive an aggregate of $50.1 million in death benefits and also will have the opportunity

to use or transfer Settlement Scrip.  These Class Members also will automatically receive

the benefits of the Prospective Commitment if Franklin increases its cost-of-insurance

charges or decreases it dividends due to its mortality experience for one year following

July 1, 1999.

107.    Class Members who elect CEP will have an opportunity to present

their individual claims to a Claim Evaluator chosen by Lead Counsel.  If they are

successful, they will receive cash awards.  Franklin will make up to $40 million (plus

interest) available for distribution through CEP. A CEP claimant who receives the

highest level designation for his or her claim may receive an award that approximates the

economic loss suffered. *See* Weiss/Stoia Decl. ¶ 78; Santillo Decl. ¶ 29; *see also* Priest

Aff. ¶ 32 ("[t]hese various forms of [CEP] relief represent substantial restitution of

meritorious claims and, in fact appear not fully adjusted to reflect the defenses that would

be available to the Defendants if affected class members were required to prosecute active

litigation"). The Court agrees with the actuaries' conclusion that, even if the total amount

of awards made under CEP require a pro rata reduction of all awards, CEP still will

provide substantial compensation to individual CEP claimants. *See* M&R Report at 39.

108. The Court notes that the Settlement makes additional value

available, including that derived from the very existence of CEP and the Part VIII ADR

Process (both of which will provide fair, simple and essentially cost-free mechanisms to

resolve Class Members' individual claims). *See Spitz v. Connecticut General Life Ins.

Co.*, MDL No. 1136, No. CV95-8484, slip op. at 3 (C.D. Cal. Jan. 13, 1997).

109. Additionally, the Court notes that the finality provisions for CEP

and Part VIII ADR determinations represent an appropriate and efficient means of

providing expeditious relief to the class and minimizing the burden on the Court and the

parties. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 925;

*Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741, at *7-8; *Stewart v. Rubin*,

948 F. Supp. 1077, 1082 (D.D.C. 1996), *aff'd*, 125 F.3d 1309 (D.C. Cir. 1997); *Haynes v. Shoney's, Inc.*, 1993 WL 19915, at \*18, \*42 (N.D. Fla. Jan. 25, 1993). The potential for appeals could create an ongoing administrative burden for the Court and the parties, thereby undermining one of the purposes of settling this case, *see, e.g., Bachman v. Miller*, 559 F. Supp. 150, 152 n.7 (D.D.C. 1982), and could also delay the provision of relief to the Class as a whole. Class Members who elected CEP did so after having been specifically informed through the notice package that claim decisions would not be reviewed, and Class Members are properly bound by their elections. *See, e.g., Bachman v. Miller*, 559 F. Supp. at 151-52; *Gramling v. Food Mach. & Chem. Corp.*, 151 F. Supp. 853, 855-56 (D.S.C. 1957). Moreover, the very structure of the claim procedures (including, among other things, the use of objective scoring criteria that are part of the approved Settlement) should ensure that claims will be processed in a procedurally and substantively fair manner. The Court retains jurisdiction over this case to consider issues regarding whether the Settlement has been implemented consistent with the terms of the Settlement Agreement. *See Security Pac. Fin. Servs. v. Jefferson*, 259 Ill. App. 3d 914, 921, 632 N.E.2d 299, 304, 198 Ill. Dec. 240, 245 (Ill. App. Ct. 1994).

110.    For all of these reasons, there is no question that the proposed Settlement provides relief that is fair and adequate and within the "range of reasonableness." *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297,

319 (N.D. Ga. 1993) ("[i]n assessing the settlement, the Court must determine 'whether it falls within the "range of reasonableness," not whether it is the most favorable possible result in the litigation'") (internal citations omitted); *see also Woodward v. Nor-Am Chem. Co.*, 1996 U.S. Dist. LEXIS 7372, at \*49 (S.D. Ala. May 23, 1996).

111.    **Length, Complexity and Cost of Further Litigation** — The Court finds that this factor also supports approval of the Settlement. The complaint's allegations concern the sale and performance of approximately one million life insurance policies. If this case were to proceed without settlement, the resulting litigation would be lengthy, complex and expensive. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 318; *In re Manufacturers Life Ins. Co. Premium Litig.*, No. 96-CV-230 BTM (AJB), slip op. at 10 (S.D. Cal. Dec. 21, 1998); *Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741, at \*27. The proposed Settlement grants Class Members timely relief without their having to endure the risk, complexity, duration and expense inherent in continuing this litigation. *See Michels v. Phoenix Home Life Mut. Ins. Co.*, 1997 N.Y. Misc. LEXIS 171, at \*88; *Ressler v. Jacobson*, 822 F. Supp. at 1554.

112.    **Stage of Proceedings at Which Settlement Was Achieved** — In assessing this factor, the relevant inquiry is whether the parties have conducted sufficient discovery to assess the strengths and weaknesses of their claims and defenses. *See, e.g., Woodward v. NOR-AM Chem. Co.*, 1996 WL 1063670, at \*21. Comprehensive

discovery is not necessary, *id.*; "only some reasonable amount of discovery" is required, *Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741, at *31 (internal quotation marks omitted). In this case, extensive document discovery and numerous depositions were completed. The discovery enabled plaintiffs' counsel not only to assess the legal and factual merits of their clients' claims, but also to negotiate a settlement that provides relief specifically tailored to Class Members' needs. *See, e.g., id.* (discovery has afforded the parties "a clear view of the strengths and weaknesses of their cases"); *Ressler v. Jacobson*, 822 F. Supp. at 1554-55 ("plaintiffs have conducted sufficient discovery to be able to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation"); *accord Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. at 67. Thus, this factor also favors approval of the Settlement.

113. **Absence of Collusion Among the Parties** — This settlement was the product of extensive, contentious, arm's length negotiations that lasted for close to a year. *See generally* Santillo Decl. ¶¶ 11-32; Weiss/Stoia Decl. ¶¶ 68-80. These discussions did not even begin until after approximately two years of contentious litigation had taken place in both federal and state courts. These discussions did not begin until after Franklin had filed motions to dismiss and for summary judgment. The Settlement was not finalized until after plaintiffs had conducted extensive document and

witness discovery. The history of the settlement negotiations thus clearly counsels in favor of approving the Settlement.

      114.   **Substance and Amount of Opposition to the Settlement** —

There has been very little opposition to this Settlement. Only 4,526 policies (representing only 0.46% of the approximately one million Class policies) have been excluded from the Class. Supplemental Dahl Decl. ¶ 5. Only 34 objections were submitted on behalf of 41 Class Members.[6] And, as noted above, no Class Member asked to be heard at the June 1, 1999 Fairness Hearing. This small amount of opposition strongly supports approving the Settlement.

      115.   Moreover, none of the 34 objections has merit. Most of the objections are either complaints against Franklin or challenges to the form of settlement benefits made available; a few criticize aspects of CEP, the opt-out procedure, the class

---

6.  The Court notes that three objections (filed on behalf of four Class Members) have been withdrawn. Additionally, one objector (Michael Murphy) filed a timely request to exclude himself from the Class after he filed an objection. Because Mr. Murphy is no longer a Class Member, he lacks standing to object and his objection is invalid. *See, e.g., In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 172 (5th Cir. 1979), *cert. denied*, 452 U.S. 905 (1981). In any event, none of these objections would justify disapproval of this settlement.

In addition, as noted above, one objector (Ray Huff) withdrew his objection in light of the amendment that was made to the Settlement on May 21, 1999. As discussed above, this amendment enhanced the relief available to Class Members.

notice and plaintiffs' requested attorneys' fees. After due consideration, the Court finds
that none of these objections prevents the Court from approving the Settlement.

          a.      **Adequacy of Settlement Benefits** — A number of
objections are based on the Class Member's preference for some type of relief other than
the death benefits and opportunity to buy a new policy that comprise two forms of
General Policy Relief. In making this objection, these Class Members ignore the Claim
Evaluation Process, through which they can seek a cash award. Moreover, their assertion
that the free death benefits are worthless because the objectors do not expect to die is
misguided. Regardless of whether a death benefit actually is paid, the *free* protection
itself has value to the Class as a whole, as demonstrated by Class Members' prior
purchase of life insurance. *See In re Real Estate Title & Settlement Servs. Antitrust Litig.*,
1986 WL 6531, at *18 (E.D. Pa. June 10, 1986) (extra title insurance provides benefit to
all class members, regardless of whether they make any claim for the insurance), *aff'd*,
815 F.2d 695 (3d Cir. 1987), *cert. denied*, 485 U.S. 909 (1988). Similarly flawed is the
objectors' assertion that Settlement Scrip is worthless because they may not wish to use
it. Settlement Scrip provides Class Members — a population with a known interest in
life insurance — with an opportunity to purchase a life insurance product with a
substantial Franklin contribution if they so wish. This opportunity has value. *See Dunk
v. Ford Motor Co.*, 48 Cal. App. 4th 1794, 1805, 56 Cal. Rptr. 2d 483, 490 (4th Dist.

1996) (fact that some class members might not use settlement relief to obtain discounted

products does not warrant disapproval of settlement). Moreover, Settlement Scrip is fully

transferable by Class Members to family members or third parties (for value if they

wish), and Franklin will set up a website to allow Class Members and others to post an

interest in transferring or obtaining Scrip. Under certain circumstances (defined in the

Settlement Agreement), simplified underwriting will apply to policies purchased with

Scrip.

           b.      Furthermore, the narrow focus of these objectors on their

own personal situations ignores that they have chosen to litigate their claims in a class

action and that the proposed settlement must be analyzed in terms of the relief provided

to the entire Class. *See In re Xoma Corp. Sec. Litig.*, 1992 U.S. Dist. LEXIS 10502, at

*10 (N.D. Cal. July 10, 1992) ("[t]he Court must be concerned with ensuring fairness to

the class as a whole, rather than with satisfying any particular plaintiffs' demands"). If

the objectors want *individualized* relief, CEP exists to provide it.

           c.      These objectors' preferences for other types of relief are

irrelevant. The issue is not whether the proposed settlement could have offered *different*

or even more generous relief; the only question is whether the benefits *actually being*

*offered* are fair, adequate and reasonable. If they are, the settlement should be approved.

*See Bowling v. Pfizer*, 143 F.R.D. at 169 (settlement is "not a wish-list of class members that the Defendants must fulfill").

                 d.      Finally, the few objections that the settlement is "favorable" or "advantageous" to Franklin appear to be based on the mistaken assumption that Franklin's liability for the allegations in the complaint is not in dispute. That is simply not the case. Questions of whether the settlement will sufficiently punish Franklin thus do not enter into the fairness consideration. Instead, the focus is on the value to the Class. *E.g.*, *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 962 F. Supp. at 557; *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. at 70.

                 e.      **CEP is an Efficient and Fair Process** — One objector contends that CEP is arduous. This objection ignores that fact that CEP is *far* less burdensome than traditional litigation and eliminates many of the legal obstacles claimants would face if their claims were litigated. Moreover, the decision maker (the Claim Evaluator) is selected by Class Member's own counsel, and the process is prompt and free of the costs and expenses claimants would incur in pursuing private litigation.

                 f.      A few other Class Members object to the $40 million (plus interest) CEP fund. Some of these objections are based on a hypothetical fear — that *every* Class Member would elect CEP — that has not come to pass. Fewer than 5% of Class Members have said they intend to submit a claim to CEP. Dahl Decl. ¶ 53. As

discussed above, the actuaries have concluded that the $40 million (plus interest) Franklin

will provide for CEP relief will be more than enough to provide compensatory relief to all

successful claimants.  In addition, the objection that CEP relief might be less than the

damages that injured Class Members have incurred fails to take into account that the

allegations against Franklin have not been proven, and that a settlement, "by its very

nature, [is] a compromise."  *Hernandez v. Talman Home Mortgage Corp.*, 1986 U.S.

Dist. LEXIS 26212, at *3-4 (N.D. Ill. Apr. 28, 1986); *accord King v. South Cent. Bell

Tel. & Tel. Co.*, 790 F.2d 524, 530 (6th Cir. 1986).

        g.     **The Notice Is Clear and Comprehensive** — The

objection that the notice "was poorly written and difficult to understand" is without basis.

Likewise, the objection that the individual notice package should have been delivered "by

some means of verification more reliable and verifiable than ordinary first-class mail" is

unfounded.  *E.g.*, *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.D.C.

1992).  The objection that the notice should have described the benefits Class Members

could receive from CEP ignores the fact that the relief a particular Class Member might

receive depends on the claim he or she makes.  In any event, any Class Member who

called the toll-free telephone bank and requested a specific value for a potential CEP

award would have been provided with an estimated range for relief based on the Class

Member's policy and the type of claim he or she would likely make.

h.      **Objections to Attorneys' Fees Are Unfounded** —

Objections to the amount of attorneys' fees and expenses to be paid to plaintiffs' counsel

overlook the corresponding benefits Class Members will receive because of plaintiffs'

counsel's commitment of time and resources to this action. The suggestion by some

objectors that plaintiffs' counsel did nothing to deserve the fee award ignores the

contentious character of this litigation and the significant risk that plaintiffs and their

counsel could have walked away from a litigation of these claims empty-handed. The

record before the Court reflects the enormous and continuous resources (including out-of-

pocket expenses) plaintiffs' counsel have dedicated to this litigation. In addition,

plaintiffs' counsel will have continuing obligations to the case for which no additional

compensation will be awarded. *See* Weiss/Stoia Decl. ¶ 194. The implied objection that

plaintiffs' counsel did not adequately represent the Class, but rather "sold out" the Class

for a fee has absolutely no basis in fact. Finally, the Court notes that the payment of fees

and expenses to plaintiffs' counsel will have *no effect* on the relief available to Class

Members.

i.      **The Remaining Objections Are Without Merit** — The

other objections made by Class Members are equally unfounded. For example, the

objection that Class Members should not be bound by the Settlement unless they "opt-in"

to the Class is contrary to Fed. R. Civ. P. 23, which expressly provides for opt-out, *not*

56

opt-in, class actions. The vague assertions in one objection that the Class Members

submitting it "be allowed the time as is necessary to prepare a fair, reasonable and

adequate modification" to the Settlement Agreement is not a substantive objection to the

Settlement. In any event, these Class Members had adequate time to "prepare" whatever

they wished to submit. Finally, some submissions that are styled "objections" are really

complaints about the underlying sales transactions rather than objections to the

settlement.

116. **Views of Experienced Class Counsel** — The final factor to be

considered in determining whether to approve the Settlement is the experience of class

counsel and their views of the Settlement. *Cotton v. Hinton*, 559 F.2d at 1330; *Ressler v.*

*Jacobson*, 922 F. Supp. at 1553. Plaintiffs' counsel have extensive experience in

litigating and settling large, nationwide class actions — including life insurance sales

practice cases. Numerous courts have recognized their vast experience and expertise, and

have given counsels' opinion substantial weight in approving other similar settlements.

*E.g.*, *Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741, at *28; *In re*

*Manufacturers Life Ins. Co. Premium Litig.*, No. 96-CV-230 BTM (AJB), slip op. at 14

(S.D. Cal. Dec. 21, 1998); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.

Supp. at 542; *Natal v. Transamerica Occidental Life Ins. Co.*, No. 694829 (Cal. Super.

Ct., San Diego County, July 28, 1997). This factor also weighs in favor of finding the
Settlement fair, adequate and reasonable.

117.    **The Settlement is Fair, Adequate and Reasonable** — For all of
the reasons set out above, the Court finds that the Settlement in this case is fair, adequate
and reasonable.

## VII.   FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO PLAINTIFFS' ATTORNEYS' FEES AND EXPENSES

### A.    Attorneys' Fees and Expenses of Plaintiffs' Counsel of Record

118.    Plaintiffs have requested an award of attorneys' fees and the
reimbursement of expenses in an amount not to exceed $13 million, comprised of
approximately $12.2 in fees and $828,000 in current expenses. *See* Plaintiffs' Fee
Declarations filed on May 17, 1999. This fee request reflects more than 32,000 hours of
time expended by over 100 attorneys and 20 law firms over nearly three years valued at
$8.3 million at current rates. *Id.*; Weiss/Stoia Decl. ¶ 191. The Court finds that the fee
and expense negotiations were conducted at arm's length, only after the parties had
reached agreement on all terms of the Settlement. There is absolutely no evidence in this
case that the Settlement, or the fee and expense agreement, was in any way collusive.
Under these circumstances, the Court gives great weight to the negotiated fee in
considering the fee and expense request.

Content:

benefit. *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991);
*see also* Small Decl. at 7-10. This accomplishes two objectives. First, it is consistent
with the private market place where contingent fee attorneys are regularly compensated
on a percentage of recovery method. *In re Public Services Co. of New Mexico*, [1992
Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96, 988, at 94,291-92 (S.D. Cal. July 28,
1992). Second, it provides a strong incentive to plaintiffs' counsel to obtain the
maximum possible recovery in the shortest time possible under the circumstances. *See In
re Continental Illinois Sec. Litig.*, 962 F.2d. 566, 572 (7th Cir. 1992); *Duhaime v. John
Hancock Mut. Life. Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997) (the "advantage of
the [percentage] method . . . is that it focuses on result, rather than process, which better
approximates the workings of the market place") (citation, internal quotations omitted).
Finally, the percentage approach reduces the burden of the Court to review and calculate
individual attorney hours and rates and expedites getting the appropriate relief to class
members. *See In re Continental Illinois*, 962 F.2d at 572; *In re Activision Sec. Litig.*, 723
F. Supp. 1373 (N.D. Cal. 1989).

122.    The court in the *Johnson* case spelled out six factors a court must
consider in evaluating requests for attorneys' fees. 488 F.2d at 717-19. Those factors
include: (*i*) the results obtained, (*ii*) the economics of the prosecution of the class action
and the experience of counsel, (*iii*) the professional skill and standing of respective

counsel, (*iv*) the customary fee for similar cases, (*v*) the time and labor required and, (*vi*) the reaction of the Class. As discussed below, the court has considered each of these factors in turn and finds that plaintiffs' request is fair and reasonable.

a. **The Results Obtained** — Courts frequently consider this factor to be the most critical. In this instance, plaintiffs have negotiated a process which provides substantial economic relief tailored to each class member's specific situation, though a fair and expeditious process. These benefits have a value of at least $90.1 million. In the Court's view, this result is extraordinary and warrants approval of plaintiffs' request.

b. **The Economics Involved** — Plaintiffs' counsel undertook this litigation – which has extended over three years – on a completely contingent basis. During that period plaintiffs' counsel never knew whether or not they would be compensated, yet expended — to date — over 32,000 hours of time and more than $828,000 in expenses. In return for that expenditure, plaintiffs' counsel have negotiated a Settlement which provides real benefits to class members, yet request a fee well below that typically awarded in contingent fee cases. There is also work remaining for plaintiffs' counsel in implementing the Settlement for which they will receive no additional payments.

c.     **The Professional Skill And Standing Of Counsel** —

Plaintiffs' counsel here are among the most experienced in the country in both complex

class actions and in similar life insurance deceptive sales practices litigation.  The

Settlement is a direct result of their experience, reputation and ability in these sorts of

cases.  Similarly, Franklin was represented by able counsel, both in-house and its outside

counsel.  The professional skill and standing of the representation in this case are beyond

question and support approval of the requested award.

d.     **The Customary Fee For Similar Cases** — The evidence

in this case, including the affidavits, declarations and memorandum in support of Final

Approval, establishes that the *minimum* economic value of the settlement is $90.1

million.  Long Decl. ¶¶ 12(a)-(c), (e), 14-18, 27-29; M&R Report at 30.  Given those

valuations, plaintiffs' counsel's request for fees and reimbursement of expenses is

roughly 14.5% of the minimum economic value of the settlement to Class Members.

Weiss/Stoia Decl. ¶ 181.  These costs do *not* include other substantial benefits to the

Class, including the costs incurred in providing notice to the Class, administering the

Class Action Information Center, and implementing and administering the Settlement —

costs which are ordinarily borne by plaintiffs.  If the Court considers the additional

benefits being covered by Franklin (which are usually paid for by the Class) to be

substantial and real benefits, *i.e.*, the cost of administering the Settlement, the cost of

notice, the cost of the Franklin Class Action Information Center, and the like, the total

benefit to the Class is approximately $108.6 million, excluding the value of the

Settlement Scrip. Plaintiffs' Submission at 66-68; Small Decl. at 6-7. Therefore,

plaintiffs' fee and expense request is approximately 12% of the total Settlement value.

*Id.* Finally, these percentage amounts do not include the substantial value provided by

the Settlement Scrip. Assuming only 5% of the Scrip is utilized by the Class, the total

value increases approximately $46.4 million, thereby further reducing the requested fee

award. *See* Long Decl. ¶ 23; Weiss/Stoia Decl.¶ 145. Moreover, it is important to note

that the amount of fees and expenses to be paid by Franklin are separate and apart from

any recovery by the Class and will in no way diminish the value of the settlement benefits

to be provided to the Class. *Id.* ¶ 146.

              e.      This amount is more than reasonable and is historically

within the amounts awarded in class actions in this area and nationally. *See* Small Decl.

at 7-10; *see also Camden I*, 946 F. 2d. at 774-75 (most common fund fee awards between

20-30%, with upper limit of 50%); *Lopez v. Checkers Drive-In Restaurants, Inc.*, 94-282-

CIV-T-17C (M.D. Fla. Nov 22, 1996) (30%); *Minnick v. Pages, Inc.*, 95-277-CIV-T-21C

(M.D. Fla. Feb 2, 1996) (30%); *In re Belmac Corp. Sec. Litig.*, 92-1814-CIV-T-23-(c)

(M.D. Fla. April 6, 1994) (31%); *Ressler v. Jacobsen*, 149 F.R.D. at 653 (30%).

        f.     **The Time And Labor Required** — Plaintiffs' counsel expended over 32,000 hours of attorney time valued at approximately $8.3 million in litigating and resolving this action. This expenditure of time and effort, on a wholly contingent basis, confirms the reasonableness of plaintiffs' counsel's fee request under the lodestar/multiplier approach. It is important to note, however, that time expended is just one factor in examining the reasonableness of a fee award using lodestar.

        g.     This case also involved complex actuarial, accounting, financial and investment issues requiring a level of experience and expertise few other plaintiffs' counsel have achieved. Moreover, the Court understands that additional time and effort will be required after approval to insure that the Settlement is properly implemented. Some of those post-settlement responsibilities include:

- staffing the Class Action Information Center to monitor calls of Class Members, and reviewing and negotiating phone scripts, training manuals and addenda;

- answering inquiries from policyowners forwarded by Class Action Information Center operators and answering all inquiries from policyowners made directly to Class counsel;

- selecting and training the Claim Evaluator;

- establishing and monitoring the CEP process with the Claim Evaluator and defendants and negotiating resolutions to all issues arising in the course of the process; and

- consulting and conferring with Class Members and Franklin regarding any disputes that may arise in CEP.

h.      Under these circumstances, plaintiffs' counsel's request for

a multiplier of 1.46 is fully warranted. This multiplier is well within the range of

multipliers for similar litigation, which have ranged from 1 to 4 and have reached as high

as 10. *See, e.g., In re Beverly Hills Fire Litigation*, 639 F. Supp. 915 (E.D. Ky. 1986)

(multiplier of 5); *Ace Seat Cover Co. v. Pacific Life Ins. Co.*, Case No. 97-CI-00648, at

87 (Ky. Cir. Ct., Kenton County Nov. 19, 1998) (multiplier of 2.65); *Elkins v. Equitable

Life Ins. Co. of Iowa*, 1998 WL 133741, at *36  (multiplier of 2.34); *Willson v. New York

Life Ins. Co.*, 1995 N.Y. Misc. LEXIS 652, at *94 (multiplier of 4.6); *Michels v. Phoenix

Home Life Mutual Ins. Co.*, 1997 N.Y. Misc. LEXIS 171 at *95 (multiplier of 3.3); *In re

Prudential Ins. Co. of America Sales Practices Litig.*, 962 F. Supp. 450 ; *Natal v.

Transamerica Occidental Life Ins. Co.*, No. 694829 (Cal. Super. Ct., San Diego County

July 28, 1997) (multiplier of 2.2); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F.

Supp. at 380 (multiplier of 2.4).

i.      **The Reaction Of The Class** — The number of objections

to plaintiffs' counsel's fee request is *de minimus*. Over 1,059,000 individual notice

packages were mailed and a summary notice was published in 55 major national and

regional newspapers across the country. Those notices informed class members of the

requested fee award, yet the Court has received only four objections addressing attorneys'

fees. This lack of objections is "strong evidence of the propriety and acceptability of that request." *Ressler v. Jacobsen*, 149 F.R.D. at 656.

123.    Application of the pertinent *Johnson* factors supports approval of the 14.5% fee and expense award, which is hereby granted in full.

124.    In sum, plaintiffs' request for attorneys' fees and reimbursement of expenses is fair and reasonable under all relevant criteria.  The Court hereby approves the full fee and reimbursement of expenses in the amount of $13 million, to be paid by defendants to Lead Counsel consistent with the terms of the Settlement Agreement.

### B.    Attorneys' Fees and Expenses of Objector Huff

125.    Frank H. Tomlinson, Esq. on behalf of a group of counsel ("Objector's Counsel") has requested an award of attorneys' fees and reimbursement of expenses in any amount not to exceed $600,000 in connection with Objector's Counsels' representation of Class Member Ray Huff.

126.    As noted above, the objections raised by Mr. Huff resulted in a First Amendment to the Stipulation of Settlement.  As further noted above, this amendment enhanced the relief available to Class Members.

127.    Based on the submissions of Objector's Counsel to this Court, on defendants' and Lead Counsel's representation to this Court that they do not object to awarding Objector's Counsel the amounts for which they have applied and on the fact

that this amount will not reduce the amount of relief available to Class Members, this

Court finds it appropriate to award Objector's Counsel $600,000 in attorneys' fees and

expenses.  The defendant is instructed to pay this amount to Objector's Counsel in the

manner specified in the May 24, 1999 agreement resolving Mr. Huff's objections, which

is on file with the Court.

                                        U.W. CLEMON
                                  UNITED STATES DISTRICT COURT

Dated: _____ 25___, 1999